Filed 8/7/26  Noel v. Collier-Key CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)


| | |
|---|---|
| ANN NOEL et al., <br>     Plaintiffs and Respondents, <br><br> v. <br><br> DANA COLLIER-KEY, <br>     Defendant and Appellant. | C102784 <br><br> (Super. Ct. No. SCCV-CVCV2020-757) |


SUMMARY OF THE APPEAL

Plaintiffs Ann and Robert Noel (collectively, the Noels; because plaintiffs share the same surname, we will refer to them individually by their first names to avoid confusion) and defendant Dana Collier-Key served at various times on the Klamath River Country Estates Owners Association (Association) board of directors (Board) and its committees.  After Collier-Key sent several derogatory email messages and made social media posts about the Noels and their involvement in the Association, effectively accusing them of criminal and unethical conduct, including engaging in an illegal kick-back scheme with a contractor hired to fix the Association's roads, they sued Collier-Key for defamation, among other things.

Collier-Key brought an unsuccessful motion to strike the defamation action under Code of Civil Procedure section 425.16, and on appeal this court affirmed the denial.

1

The case proceeded to a bench trial, and the trial court entered judgment in the Noels' favor. The trial court awarded the Noels $250,000 in damages, with $100,000 of that amount representing punitive damages.

In this appeal Collier-Key raises four arguments. First, she argues the trial court erred in applying our decision in the first appeal when it concluded Facebook posts were "not protected," and then looked to the Facebook posts to find Collier-Key liable for defamation. Second, she argues the trial court erred by applying the wrong standards for establishing the actual malice courts must find to hold defendants liable for defamation when the subject of the purported defamatory publication is a public figure. Third, she argues the trial court erred by failing to issue a statement of decision. Fourth, she argues the trial court erred by failing to require evidence of her financial condition before it awarded punitive damages.

We find the trial court erred when it interpreted our earlier opinion to identify the scope of publications to be considered as to the defamation claim, though it is not clear this error put Collier-Key at a disadvantage.

We also find that the trial court applied the wrong definition and standard of proof for actual malice, which error requires the judgment be reversed.

We do not consider the third and fourth arguments. On remand, the trial court will need to conduct a new trial, evaluate the evidence of liability applying a different standard of actual malice to the extent publications involve a public figure (when determining liability) or a public issue (if awarding certain categories of damages), and then enter a judgment based on that evaluation. Once the trial court reaches a conclusion regarding liability, it will need to consider damages considering its revised liability findings.

Facts

The Second Amended Verified Complaint and the defendant's answer to that complaint allege:

The Klamath River Country Estates subdivision (KRCE) is a single-family-only residential planned development, in Siskiyou County, California, consisting of about 2,054 residential lots. It includes about 29 miles of private roads, and recreational and other amenities in the common interest development. The Association is a nonprofit entity which is organized to provide services to the residents of KRCE, and it has responsibility for maintaining and repairing the common areas. The Association is governed by the all-volunteer Board and by volunteer officers. Each owner of a lot in the KRCE is a member of the Association and pays annual assessments to the Association for common area repairs and maintenance.

At the time the operative complaint was filed, and at all times relevant to the action, Ann was a member of the Board and the treasurer of the Association. Robert has been a member of the Association's roads committee. Collier-Key, at one point, served on the Board with Ann.

In 2019 and 2020 Collier-Key made statements in emails and Facebook posts that accuse Ann of crimes which bore on Ann's reputation and fitness to be the Association's treasurer and a Board member, including allegations of breach of fiduciary duty. Collier-Key made the statements with the intent to cause third parties to believe that Ann was not worthy of being a Board member. Collier-Key either sent the subject emails to other Board members or she sent them to Ann and copied others.

On October 21, 2019, defendant Collier-Key sent the following email (Email 1) to five people including Ann: "oh the irony of noel writing this letter listing her past crimes against the association as well as her dreams for future violations against members."

On November 16, 2019, defendant Collier-Key sent an email (Email 2) to Ann, and copied five others: "you know what would quiet your anxieties and fears?  If you weren't a lying whore of satan.  HAHA, how you gonna call on God when you spit on all that is good and truthful?  you hypocrite."

On November 16, 2019, defendant Collier-Key also sent an email (Email 3) to Diana Gwaltney, a Board member, and copied five others including Ann: "I hope you bitches are happy that you cost us another 80k dumb ass whores of satan."

On December 18, 2019, defendant Collier-Key sent an email (Email 4) to Ann, and others, including Board members:  "the Klamagram [an Association newsletter] is garbage.  Full of fucking lies and nothing like the one we agreed to publish.  More bullshit headgames.  It isn't working for you screwy crew idiots.  I tell the members the truth and that ends your fucking fantasy.  NO ONE even reads this shit, are you kidding?  You women are all 4 a waste of air.  the crew are all known to be nothing but liars and fools.  your reputation precedes you."  Collier-Key made it clear in her publications and pronouncements that "the crew" meant Ann, Gwaltney, and other Board members.

On January 25, 2020, defendant Collier-Key sent an email (Email 5) to Ann and copied six others:  "but you are the one pretending to be a treasurer, and it should be part of YOUR report.  Hey scumbag you mean footwork like your woman beater husband and his band of nitwits did when they supposedly walked the roads.  You lying whore of satan."

In February 2020, Collier-Key began posting inflammatory messages about the Noels on KRCE.net, a privately-owned Facebook page which is not owned or operated by the Association.

On February 3, 2020, defendant Collier-Key posted the following (Posted Allegation 1): "noel is just lying here, wallowing in deception like a fat little pig in her slop.  Why does she think everyone else is as stupid as she and the crew are.  The (illegal)

4

notice about filling a vacant board seat 100% has to be offered to every board member. Not just offered to those in her twisted crew."

On April 4, 2020, defendant Collier-Key posted (Posted Allegation 2): "I guarantee the crew fired CFM [a financial management services company], because they were doing a good job and our money could not be stolen as easily as the [sic] have been able to steal it in the past."

In April 2020, defendant Collier-Key posted the following (Posted Allegation 3): "I hear the Klamagram just came out and its total bullshit. Anyone who believes a word from ann noel is a fool!!! Legal fees ann? ..."

On or about July 1, 2020, defendant Collier-Key posted the following (Posted Allegation 4): "Moley, moley, molian. Here moley-trolly. I have a message or the evil ones. Bios have to be in today by noon. We shall see if I get voted back onto the board. Please tell lloyd I hope he gets re-elected. So [sic] I can chew him up and spit his wimpy, weasel, sign stealing ass back in wallass' ugly mug. And van smelt, oh please run again. I'm gonna hold your feet to the fire every meeting. You're gonna run your idiot, narrow ass ragged just trying to repair all you helped destroy. I'll see to that. As for Noel, I'll remind you regularly what losers and liars and thieves you and your woman-beating husband are. And wallass, wait until you see what we have in store for you and your kinky husband. You 2 twisted perverts are finished. Crewbies, and hangers on to the crew, 2021 is gonna make 2020 feel like a walk in the park."

In or about July 2020, defendant Collier-Key posted the following (Posted Allegation 5): "You all can scroll down and see pics I posted of a trashed property that was horrible and sent an email asking for the board to clean it up. Whore ann noel said it was probably my property and I should clean it up. She is insane!!!"

In August 2020, defendant Collier-Key repeatedly posted on KRCE.net (Posted Allegation 6) about the Noels, accusing them of stealing at least $10,000.00 from KRCE

5

and using KRCE's money to build a deck on their home, and possibly also using KRCE's money to put a roof on their home.

On or about August 2, 2020, defendant Collier-Key posted the following (Posted Allegation 7) about Ann: "She just had a new deck built and is having a roof put on. Mind you there [*sic*] were living hand to mouth before she got back on the board and the [sic] hired Peltier to over charge and kick down that bonus deck money. Buy her a roof next ..." Text from the KRCE bulletin board set forth road repair costs KRCE expended.

On or about August 2, 2020, defendant Collier-Key also posted the following messages (Posted Allegation 8) about Ann: "She thinks we don't know she has manipulated many documents in the past, including opening sealed files and changing numbers before mailing them out to 40 some people. Layers upon layers of federal crimes." And "They were about to lose their house to foreclosure not too long ago. Now Peltier comes along and cha-ching home improvement money. Think about it."

On August 12, 2020, Defendant Collier-Key posted the following (Posted Allegation 9) about the Noels: "Calling all trollians! Take this to your leaders ... if noel would have saved some of that $10,000 in deck money, she could have paid for her own campaign post cards." And, "WOW!!! noel has flipped her cookie!! Can we say DESPERATION! Desperately seeking susan! Hahaha! Let me clear up a few of her lies. [¶] ... #5 she and wallass refused to pay assessments and encouraged others to make up their own random assessment payment plans until it was shown that their trick was futile and then they all had to pay with interest but wallass, she was excused to offset court costs. [¶] ... #7 roads were postponed because we are broke from paying lawyers and court costs. The crew hired Peltier, a known crook, rather than Evans or Rhoades, who are both reputable contractors. Ask yourselves why? Roads are not showing the work done equals amount paid for these jobs. Half ass work for twice the money. [¶] #8 road committee was made up of noel and van pelt's husbands and one innocent man who

6

actually wanted to do good for KRCE. I understand he gave up early on. I'm betting he was put off by the cronyism."

On August 15, 2020, Defendant Collier-Key posted the following (Posted Allegation 10) about the Noels: "We can all see where the money went. By that I mean the noel's new $10,000 deck that they could not afford before the roads scam was played out."

At least some of Collier-Key's statements accuse Ann of crimes which bear on Ann's reputation and fitness to be the Association's treasurer and a Board member, including allegations of breach of fiduciary duty. Collier-Key made the statements with the intent to cause third parties to believe that Ann was not worthy of being a Board member.

Also during the proceedings in the trial court, in a request for admissions, Collier-Key admitted she did not know the source of funds the Noels used to build their deck.

Proceedings Through the First Appeal

In their earlier first amended complaint, the Noels accused Collier-Key of defamation based on the above statements.

Collier-Key filed a special motion to strike the defamation cause of action under Code of Civil Procedure section 425.16, also known as the anti-strategic lawsuits against public participation (anti-SLAPP) statute, arguing the defamation claim implicated Collier-Key's constitutional free speech rights concerning public issues related to the Association's business and governance.

Code of Civil Procedure section 425.16, subdivision (b), subjects, "[a] cause of action against a person arising from *any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue* ... to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the

7

plaintiff will prevail on the claim." The statute defines the italicized text above as (1) any written or oral statement or writing made before a legislative, executive or judicial proceeding or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. (Code Civ. Proc. § 425, subd. (e).)

Resolving an anti-SLAPP motion requires the trial court to engage in a two-step review process. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.) First, the court decides whether the defendant has made a threshold showing that the challenged claim arises from protected activity under Code of Civil Procedure section 425.16. (*Ibid.*) If the defendant makes the requisite showing, the burden then shifts to the plaintiff to demonstrate the claim's merit by establishing a probability of success similar to a summary judgment analysis. (*Ibid.*)

The trial court found that Emails 1 through 3, and 5 were not protected by the anti-SLAPP statute, reasoning the emails were sent to a small group or other Board members and not published in a public place or public forum. The trial court found Email 4 was not protected by the anti-SLAPP statute because it was an opinion, did not regard a public issue pertinent to the Association, and was not directed specifically at Ann.

The court found Post Allegations 1, and 6 through 10 were protected under the anti-SLAPP statute because they were "made on a public forum (KRCE.net) and dealt with Ms. Noel's activities and duties as a board member and/or her credibility as a board member with regard to issues of interest to the association." It found Post Allegations 2

through 5 were not protected because, although posted on KRCE.net, they did not concern issues pending before the Association.

Having found Collier-Key met her burden at least with respect to some of the statements, the trial court looked at the second prong of the anti-SLAPP analysis and determined the Noels had met their burden to show their defamation claims had enough merit to proceed. The trial court then issued an order denying the anti-SLAPP motion.

In an unpublished opinion, we affirmed the trial court's ruling but disagreed with respect to some of its reasoning. (See, generally, *Noel v. Collier-Key* (Mar. 6, 2023, No. C094292) ___Cal.App.5th___ [2023 Cal. App. Unpub. LEXIS 1352] (*Noel*).)

Notably, for this appeal, in the earlier opinion we disagreed with the trial court's assessment of Emails 1 through 3 and 5, and Post Allegations 2 through 5. (*Noel, supra,* (Mar. 6, 2023, No. C094292) ___Cal.App.5th___ [2023 Cal. App. Unpub. LEXIS 1352].) We wrote: "To the extent the trial court found that certain emails Collier-Key sent to Ann and other Board members [Emails 1 through 3 and 5] were not made in a public forum, and thus were not protected, we conclude otherwise. [Code of Civil Procedure s]ection 425.16, subdivision (e)(4) includes conduct in furtherance of free speech rights regardless whether that conduct occurs in a place where ideas are freely exchanged; the subdivision 'governs even private communications, so long as they concern a public issue.' (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th. 883, 897, [].) Here, the emails generally discussed Ann's alleged past criminal conduct against the Association and its members while serving on the Board, her supposed dishonesty and poor management while an elected Board member, and her husband's alleged shoddy and dishonest work as a volunteer on the Association roads committee, all of which would have been issues of interest to the Association members.

"Likewise, to the extent the court concluded that certain social media posts were not protected by the anti-SLAPP statute because they did not concern issues pending before or of interest to the Association [Post Allegations 2 through 5], we again disagree.

9

The posts in question insinuated that certain members of the Board, which Collier-Key referred to as 'the crew,' including Ann, improperly fired an Association contractor that was doing a good job of preventing the Association's money from being stolen, that none of the Association members should believe Ann or anything in the Association's newsletter (the Klamagram), whether Collier-Key would be voted back on the Board during Association elections and how she would serve with other potential or current Board members, including Ann, and how Ann, while serving on the Board, refused Collier-Key's request to clean up a dilapidated property within the Association. The content of these social media posts related to topics of undoubted interest to the Association and its members as they touched on governance, elections, and duties of the Board and its volunteers. (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 474-475, 479, [][allegedly defamatory statements concerning the manner in which a large residential community would be governed concerned issues of public interest]; *Silk v. Feldman* (2012) 208 Cal.App.4th 547, 553, [] [courts have recognized a homeowners association functions as a quasi-governmental entity, paralleling the powers and duties of a municipal government].)" (*Noel*, *supra*, (Mar. 6, 2023, No. C094292) ___Cal.App.5th___ [2023 Cal. App. Unpub. LEXIS 1352.)

Having found Collier-Key met her burden to show some of the statements were protected by the anti-SLAPP statute, and therefore were subject to a motion to strike, we then proceeded to the second-prong of the analysis and asked if the Noels had demonstrated a probability of prevailing on their defamation claims. (*Noel*, *supra*, (Mar. 6, 2023, No. C094292) ___Cal.App.5th___ [2023 Cal. App. Unpub. LEXIS 1352].) We found the Collier-Key's arguments that the Noels had failed to demonstrate a probability of prevailing on their defamation claim lacked merit and affirmed the trial court's ruling. (See *ibid.*)

10

Second Amended Complaint through Notice of Appeal

After this court issued its decision in *Noel*, *supra*, (Mar. 6, 2023, No. C094292) ___Cal.App.5th___ [2023 Cal. App. Unpub. LEXIS 1352], the Noels filed a second amended complaint, the operative complaint.

The second amended complaint refashioned the first cause of action to one for libel specifically rather than defamation generally. It also specified which prior statements served as a basis for Ann's claims against Collier-Key and which served as a basis for Robert's claims. As to each plaintiff, the second amended complaint identified which publications qualified as libel per se and which publications qualified as libel per quod.

The matter proceeded to a bench trial. Collier-Key and the Noels all testified, and the Noels called other witnesses. Various exhibits were admitted, including a declaration made by Gwaltney.

Witnesses testified regarding Collier-Key's outbursts at board meetings, during which she would call Ann a "liar" and "lying whore of satan." According to the trial court's findings, Collier-Key also testified in a deposition that she found the Noels despicable and subhuman, and that she had hatred for them.

Witnesses also testified that at Board meetings they would ask Collier-Key to provide evidence of her allegations against the Noels, but she did not provide it. Witnesses testified about how Collier-Key's accusations were carried through the KRCE community, with rumors in the community about the Noels being thieves and dishonest.

The Noels testified about the emotional and actual damage caused by Collier-Key's allegation. Ann felt unsafe in her home, and she became withdrawn and less involved in community activities.

11

<u>Judgment</u> and <u>Appeal</u>

The trial court entered a judgment in favor of the Noels.  It awarded the Noels $150,000 in actual damages, $100,000 in punitive damages and costs for a total damages award of $250,000 plus costs.

We will address pertinent trial court reasoning in the analysis sections below.

Collier-Key filed a timely appeal.

DISCUSSION

*I*

*Defamation and the Roll of Malice*

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.'  (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 529, p. 782, citing Civ. Code, §§ 45–46 and cases.)"  (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720; *Lemke v. Sutter Roseville Medical Center* (2017) 8 Cal.App.5th 1292, 1298.)

Defamation is either libel or slander.  (Civ. Code, § 44.)

" 'Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.'  (Civ. Code, § 45.)  [Fn. omitted]  There are generally two types of libel recognized in California—libel per se and libel per quod.  'A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. ...'  [Citations.]"  (*Bartholomew v. YouTube, LLC* (2017) 17 Cal.App.5th 1217, 1226 (*Bartholomew*); see also Civ. Code, § 45a.)  In contrast, " '[d]efamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof.'  ([Civ. Code, ]§ 45a; see also

12

*MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547–548 [].)" (*Ibid.*)

" 'Special damages' means all damages that plaintiff alleges and proves that he or she has suffered in respect to his or her property, business, trade, profession, or occupation, including the amounts of money the plaintiff alleges and proves he or she has expended as a result of the alleged libel, and no other." (Civ. Code, § 48a, subd. (d)(2).)

When a plaintiff proves libel per se, damage to the plaintiff's reputation is conclusively presumed, and the plaintiff does not need to introduce evidence of actual damages to obtain a damages award--i.e., the plaintiff can collect presumed damages. (See *Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 382.)

With respect to the "unprivileged" element of defamation, California treats some communications as absolutely privileged. (See *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 718 (*Hassan*); Civ. Code, § 47, subds. (a)-(b), (d)-(e).) Absolutely privileged communications include those made, "in the proper discharge of an official duty"; during statutorily specified official proceedings, by "fair and true report" in a public journal regarding specified official proceedings, and by "a fair and true report of (1) the proceedings of a public meeting, if the meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit." (Civ. Code, § 47, subds. (a)-(b), (d)-(e).) Absolute privileges will apply regardless of malice. (See *Alpha & Omega Development, LP v. Whillock Contracting, Inc.* (2011) 200 Cal.App.4th 656, 664.) "When a publication is absolutely privileged, there is no liability, even though it is made with actual malice; malice is not a proper subject of inquiry in such a case." (*Berman v. Rca Auto Corp.* (1986) 177 Cal.App.3d 321, 324.)

By contrast, "Civil Code section 47, subdivision (c), … extends a privilege to statements made 'without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or

13

(3) who is requested by the person interested to give the information.' The privilege is recognized where the communicator and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest. (*Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1118 [].)" (*Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 353.) "For this purpose, malice is defined as actual malice, meaning ' "that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." ' (*Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 []; see *Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1370 [].)" (*Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 336, italics added (*Kachlon*); see also *Hassan*, *supra*, 31 Cal.4th at p. 718.) Once a defendant establishes that a publication is conditionally privileged, the burden shifts to the plaintiff to prove the publication was made with malice. (See *Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1121 ["Having established the statements at issue are privileged, [plaintiff] bears the burden of showing the statements were made with malice"].)

Under California law, in addition to compensatory damages, a plaintiff who proves a defendant defamed them can collect punitive damages if the plaintiff proves, "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a); *Tilkey v. Allstate Ins. Co.* (2020) 56 Cal.App.5th 521, 557.) Under the statute providing for punitive damages, " '[m]alice' is defined as 'conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others'; 'oppression' is 'despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.' (Civ. Code, § 3294, subd. (c).) ' "Despicable conduct" ' is ' "conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." ' [Citation.] ' "The mere

14

carelessness or ignorance of the defendant does not justify the imposition of punitive damages. … Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate." ' " (*Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 454-455.)

## II

### *Constitutional Limits and the Role of Actual Malice*

"*In New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [], the United States Supreme Court fundamentally altered judicial treatment of defamation actions by placing a significant constitutional limitation on the ability of a public official to recover damages for a defamatory falsehood. Emphasizing the importance of free expression and a free press under the First Amendment, the Supreme Court determined that 'public officials' may not prevail in an action for libel relating to their official conduct absent proof that the statement was made with 'actual malice.' (See also *St. Amant v. Thompson* (1968) 390 U.S. 727, 731 [] [(*St. Amant*)].) Three years later, the court held that 'public figures'—like public officials—must also prove actual malice in order to recover in a defamation action. (*Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130 [].)" (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 252-254 (*Reader's Digest*).)

In *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323 (*Gertz*), the United States Supreme Court "defined two classes of public figures. The first is the 'all purpose' public figure who has 'achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.' The second category is that of the 'limited purpose' or 'vortex' public figure, an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.' (418 U.S. at p. 351 [].) Unlike the 'all purpose' public figure, the 'limited purpose' public figure loses certain protection for his reputation only to the

extent that the allegedly defamatory communication relates to his role in a public controversy." (*Reader's Digest, supra*, 37 Cal.3d at p. 254.) The parties appear not to question the status of the Noels as "limited purpose" public figures as to this appeal.

Under the *New York Times* standards, a " 'public figure suing for defamation "must demonstrate 'actual malice' by clear and convincing evidence." [Citation.] [In this context a]ctual malice "*requires a showing that the allegedly false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'* [Citation.] The reckless disregard standard requires a 'high degree of awareness of … probable falsity … .' [Citation.]" [Citation.] "The question is not ' "whether a reasonably prudent [person] would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that *the defendant in fact* entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." ' [Citation.]" [Citation].' [Citation.] ' " 'The burden of proof by clear and convincing evidence "requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." ' [Citation.]" [Citation].' [Citation.]" (*Reed v. Gallagher* (2016) 248 Cal.App.4th 841, 861-862 (*Reed*), italics added; see also *St. Amant, supra,* 390 U.S. at p. 731 ["There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication"]; *Khawar v. Globe Internat.* (1998) 19 Cal.4th 254, 275 (*Khawar*).)

The "clear and convincing evidence" standard, "presents ' "a heavy burden, far in excess of the preponderance sufficient for most civil litigation." ' (*Hoffman v. Capital Cities/ABC, Inc.* (9th Cir. 2001) 255 F.3d 1180, 1186–1187.)" (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 84 (*Christian Research*).)

In contrast, a private figure plaintiff need only show negligence with respect to the falsity of the defamatory statement to recover compensatory damages for defamation.

16

(See *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 742.) "There is a different rule, however, for recovery of either punitive damages or damages for presumed injury" when the defamatory publication involves a matter of public concern. (*Khawar*, *supra*, 19 Cal.4th at p. 274.) When the publication involves a matter of public concern, "the United States Supreme Court has held ... even a private figure plaintiff must prove actual malice" to recover punitive or presumed damages. (*Ibid.*, citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985) 472 U.S. 749, 761, 764, 774 (plur. opn. of Powell, J.; conc. opn. of Burger, C. J.; and conc. opn. of White, J.); and *Gertz*, *supra*, 418 U.S. at p. 349.)

Additionally, "in a defamation action the burden is normally on the defendant to prove the truth of the allegedly defamatory communications. [Citation.] However, in accommodation of First Amendment considerations ... , where the plaintiff is a public figure, the 'public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation.' (*Philadelphia Newspapers, Inc. v. Hepps*[ (1986)] 475 U.S. [767,] 775 []; *Brown v. Kelly Broadcasting Co.*, *supra*, 48 Cal. 3d at p. 753, fn. 37.)" (*Stolz v. KSFM 102 FM* (1994) 30 Cal.App.4th 195, 202.) Likewise, " '[w]here disputed statements involve matters of public concern, the plaintiff in a defamation action bears the burden of showing the statements the defendant made were false.' " (*Sonoma Media Investments, LLC v. Superior Court* (2019) 34 Cal.App.5th 24, 37.)

<u>Trial Court Findings Regarding Protected and Unprotected Statements</u>

The trial court began its findings and conclusions by stating, "[t]he trial court, as affirmed by the 3rd Court of Appeals, [found] some of those statements were protected speech, specifically . . . statements made in a public forum focused on a public interest. This court does not consider those statements." The trial court then explained that statements "made in a forum other than that focused on public interests" were not protected. Specifically, the trial court found statements made on the Facebook page known as KRCE.net were not protected, because the person who managed the page

17

excluded persons who disagreed with him from access to and participation in the page. The court then focused its defamation analysis on some of the language in Post Allegations 2, 4, and 7 through 10, and did not address any of the Emails.

In her opening brief, Collier-Key argues that the trial court erred in finding statements made on KRCE.net were not protected because it is contrary to the " 'law of the case' " as established by the court's prior decision when she appealed the trial court's ruling on her anti-SLAPP motion.

Specifically, Collier-Key references the part of the *Noel* decisions where we found Emails 1 through 3 and 5 were subject to the protections of the anti-SLAPP statute because they discussed issues regarding the Noels' behavior that would have been of interest to association members. (*Noel*, *supra*, (Mar. 6, 2023, No. C094292) ___Cal.App.5th___ [2023 Cal. App. Unpub. LEXIS 1352].)

Collier-Key correctly implies that the trial court seems to have misunderstood this court's conclusions regarding (a) which statements were "protected," and (b) the import of those protections on future proceedings. This error may have been to Collier-Key's benefit, but we address it here to clarify our findings when the case proceeds to a new trial on remand.

In our prior decision, this court considered whether the publications at issue were protected under the anti-SLAPP statute. That is, we considered if the publications were of the sort for which, before proceeding with the case, we would require the Noels to clear the hurdle of demonstrating a probability of success akin to a showing usually used during the motion for summary judgment phase before proceeding further. (*Monster Energy*, *supra*, 7 Cal.5th at p. 788.)

However, finding statements were protected in the first step of the anti-SLAPP analysis did not end our inquiry.

In the second part of our analysis, we found no merit in Collier-Key's argument that, "the Noels have failed to demonstrate a probability of prevailing on their defamation

18

claim." (*Noel, supra,* (Mar. 6, 2023, No. C094292) \_\_\_Cal.App.5th\_\_\_ [2023 Cal. App. Unpub. LEXIS 1352].)  We then affirmed the denial of the motion to strike, allowing the defamation cause of action to continue.  (*Ibid.*)

Thus, in our earlier decision, first we determined that to proceed with a cause of action based on some of the alleged publications—which included *both* emails and KRCE.net postings—the Noels would need to pass the additional hurdle of proving a likelihood of success on the merits.  Then, we determined that even though the publications were protected for the purpose of the anti-SLAPP analysis, the trial court could still proceed with a full trial on the allegations.

In short, the trial court improperly interpreted our earlier decision to define the scope of statements it could consider when evaluating the Noels' defamation claims.  We found that even though statements were protected by the anti-SLAPP statute the Noels could still proceed to trial on the defamation cause of action.  We did not hold that publications found to be protected in the first prong of anti-SLAPP analysis could not be considered as a basis for finding liability under the defamation laws.

<u>The Trial Court Wrongly Identified the Standard for Actual Malice</u>

The trial court found Ann is a limited public figure.  Based on this conclusion, the trial court stated it, "must therefore determine whether the accusations made by Dana Collier-Key constitute actual malice rather than the lesser requirement of proving negligence.  Actual malice may be established if Noels prove that Dana Collier-Key acted with hatred, or ill will *or lacked a reasonable basis* for believing in the truth of her statements."  (Italics added.)

To buttress its conclusion that the evidence supported Collier-Key acted with malice, the trial court found, "the evidence presented demonstrates that Dana Collier-Key made the statements and allegations against both of the Noels without a *reasonable basis* for believing them to be true.  In fact, she seemed to make defamatory statements against Noels freely and tried to put the burden on them, or their attorney, to prove the statements

19

false." (Italics added.) The trial court pointed to evidence that Collier-Key had done, "little or no research into whether the allegations were true or not," and noted another witness had testified he was able to review homeowners association documents to determine there was no basis for Collier-Key's allegations.

Because the trial court found Ann was a public figure and actual malice was required, it needed to find the *New York Times's* standard of actual malice by clear and convincing evidence. (See *Reed*, *supra*, 248 Cal.App.4th at p. 861.) That is, it needed to find the evidence was so clear as to leave no substantial doubt (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 846) that Collier-Key subjectively entertained serious doubts as to the truth of the defamatory publications (*Christian Research*, *supra*, 148 Cal.App.4th at p. 84).

Yet when it analyzed the question of actual malice, the trial court reasoned it could find Collier-Key liable if it found she acted with *either* (1) hatred *or* ill will, *or* (2) a lack of a *reasonable* belief—developed through reasonable investigation—in the truth of the publications. That is, the trial court appears to have applied the actual malice standard used to ascertain if a qualified privilege applies under California statutes (see *Kachlon*, *supra*, 168 Cal.App.4th 316, 336; see also *Hassan*, *supra*, 31 Cal.4th at p. 718) rather that the standard that applies with respect to public figure liability and public issue damages under constitutional law.

This framework reduced the Noels' burden. First, it dispensed with a requirement to demonstrate Collier-Key's state of mind regarding the truth of her statements so long as the Noels could demonstrate she was motivated by hatred. Second, it reduced the requirement to show recklessness to a requirement to show negligence.

In sum, the trial court erred by applying the wrong legal standard to the evidence with which it was presented. We cannot say that this error did not prejudice Collier-Key. While she clearly loathed the Noels, on this record we cannot say that the trial court

20

would have reached the same findings regarding actual malice had it applied the correct standard for determining actual malice.

DISPOSITION

We reverse and remand this matter for a new trial consistent with this decision. Collier-Key shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)


                                      _____

                                      HULL, Acting P. J.

We concur:



_____

KRAUSE, J.



_____

MESIWALA, J.